IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**District Judge William J. Martínez**

Civil Action No. 11-cv-01090-WJM

TERENCE J. HANKINS,

      Applicant,

v.

KEVIN MILYARD, Warden, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

## ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

---

**WILLIAM J. MARTÍNEZ, District Judge**

      This matter is before the Court on Applicant Terence J. Hankins' Amended

Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Application")

(ECF No. 6).[1]  Respondents filed an Answer (ECF No. 22) on October 31, 2011.

Applicant filed a Reply (ECF No. 24) on November 9, 2011.  After reviewing the

pertinent portions of the record in this case including the Application, the Answer, the

Reply, and the state court record (ECF Nos. 23 and 73), the Court concludes that the

Application should be denied.

## I.  BACKGROUND

      In the prosecution's interlocutory appeal, the Colorado Supreme Court (CSC)

summarized the underlying facts of this case as follows:

---

[1] Because Applicant appears *pro se*, the Court construes his filings liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520-21(1972).  However, the Court does not serve as his advocate.  *See Hall v. Bellman*, 935 F.2d 1106, 1110 (10th Cir. 1991).

On August 24, 2007, seventy-year-old Hankins sat staring out from a police car window at a mound of soil on the far edge of his mining claim near Craig, Colorado, where he had voluntarily led two investigators whom he had invited to his home that morning.  He pointed and said, "She's under that pile of dirt."  Hankins was referring to his wife Cynthia, who had disappeared several months earlier.

Shortly after Hankins revealed the location of his wife's body, one of the investigators asked, "Terry, tell us while we're here right now, what happened that night?"  Hankins then described how he had murdered his wife Cynthia by strangling her, hitting her over the head with a crowbar, and then meticulously carving her body into quarters in their bathtub, "like butchering a deer," he said, so he could more easily transport her remains.  He then buried her body parts and all her belongings under the pile of dirt.  Thinking that no court of law would believe his claim of self defense, Hankins vacated their apartment and told friends that his wife had run off with another man.

Hankins made this statement in the investigator's car at the burial site and on the drive back to his home.  The investigators treated him politely and maintained an inquisitive, respectful tone.  Several times during and after the approximately fifteen-minute confession, investigators told Hankins, "You're free to go at any time . . . you don't have to tell us any more . . . you're still free to go."

On arriving at Hankins' home, the investigators advised Hankins of his *Miranda* rights, which he waived.  Inside, the investigators asked Hankins to again describe "from A to Z" what happened.  Now *Mirandized*, Hankins walked through the details of the events leading up to the murder, the murder itself, and what happened since.

The investigators then transported Hankins to police headquarters where they again read him his *Miranda* rights.  He signed a waiver and then gave his third confession of the day, this time captured on video inside a police interrogation room.  The following day, Hankins gave additional statements, once again preceded by a full advisement of his *Miranda* rights, which he again waived.

In the months leading up to his initial murder confession, Hankins and the local police grew familiar with each other.  The police spoke with Hankins several times, served search warrants on his home, and confiscated some of his property over the course of the summer of 2007.  Throughout these events, Hankins maintained he was not involved in his wife's disappearance, and the police did not arrest Hankins.  Before his

initial confession, investigators did have evidence linking Hankins to check forgeries and illegal narcotics.

On the day Hankins confessed to the murder, Investigators Joe DeAngelo and Jen Kenney arrived at Hankins' home, where they spent about an hour discussing Hankins' involvement in fraud and drugs. The investigators then turned the discussion towards Cynthia's disappearance. The investigators DeAngelo and Kenney emphasized they were only seeking the truth and stated that Cynthia's children deserved to have their mother buried properly. In response, Hankins agreed to show them where he had hidden Cynthia's body. Investigators commended him for allowing Cynthia to now have a "good Christian burial."

Hankins initially offered to drive the investigators to the burial site in his van. When the investigators opted to drive in a police vehicle, Hankins drove with them providing directions and carrying on a conversation in a relaxed tone. At times, Hankins and the investigators joked about matters unrelated to the case.

Following the identification of the burial site and Hankins' confessions, the Moffatt [sic] County District Attorney filed nine charges against Hankins: first degree murder; abuse of a corpse; three counts of theft; three counts of forgery; and one count of possession of oxycodone.

See *People v. Hankins*, 201 P.3d 1215, 1216-17 (Colo. 2009).

Mr. Hankins was convicted by a jury in the Moffat County District Court of first degree murder after deliberation and abuse of a corpse. On August 26, 2009, the trial court sentenced Mr. Hankins to a term of life without possibility of parole in the custody of the Colorado Department of Corrections. State Register, No. 2007CR159, ECF No. 10-1 at 5. Mr. Hankins filed a notice of appeal to the Colorado Court of Appeals (CCA) on October 15, 2009, *Id.* at 14, which was pending at the time this case was initiated.

## II. FEDERAL COURT PROCEEDINGS

Mr. Hankins initiated this action by submitting an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 to this Court on April 25, 2011. Magistrate Judge Boyd N. Boland reviewed the Application, determined that Mr. Hankins' claims more

properly were raised under 28 U.S.C. § 2254, and instructed him to file his claims on a

Court-approved form used in filing § 2254 actions.  Mr. Hankins filed an Amended

Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 on June 22,

2011.

Liberally construing the Amended Application, the Court found that Mr. Hankins

asserted the following claims:

1.  His confession was coerced by the police;

2.  He received ineffective assistance of counsel because: (a) no attorney was present during the police interrogation; (b) trial counsel was ineffective for failing to file an appeal of the CSC's order on an interlocutory appeal; and (c) appellate counsel is ineffective due to her delay in filing the opening brief on appeal;

3.  His trial was unfair because police orchestrated a bomb scare on the first day of trial to publicize his past;

4.  No *Miranda* warnings were given during the execution of the July 7, 2007 search warrant and while Mr. Hankins was under the control (equivalent of arrest) of Deputy Sheriff Gary Nichols;

5.  Police filed a false report against Mr. Hankins concerning a civil matter;

6.  Police obtained Mr. Hankins' confession in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004), when they obtained multiple confessions before *Mirandizing* him on August 24, 2007;

7.  (a) Mr. Hankins was subjected to false imprisonment on the first degree murder charge because the murder was committed in self defense; and (b) improper testimony admitted during trial violated Mr. Hankin's due process rights;

8.  The trial court erred in denying the motion for a change of venue filed by defense;

9.  Mr. Hankins' confession was coerced, based on the same grounds asserted in Claim One; and

> 10.  Police failed to protect Mr. Hankins from elder abuse perpetrated by the murder victim.

ECF No. 6. at 5-6 and 8-9.

The Court conducted a preliminary review of the ten claims and dismissed all but Claim Six and part of Claim Four.  *Id.* at 5.  The Court found that the remaining claims, except for Claims Five and Ten, were unexhausted.  Claims Five and Ten were dismissed as not cognizable in a federal habeas action.  In response to the Court's September 13, 2011 Order to Show Cause why the action should not be dismissed as a mixed petition, Applicant responded and stated that he "withdraws all unexhausted constitutional claims and relies on the Court's consideration of the inadmissibility of confessions and grave evidence."  ECF No. 16 at 2.  The remaining claims, therefore, are as follows:

> 1) No *Miranda* warning was given prior to being placed in the control of Deputy Sheriff Nichols on July 7, 2007;[2] and

> (2) Police obtained a confession in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004), when they obtained multiple confessions before *Mirandizing* Mr. Hankins on August 24, 2007.

On October 31, 2011, Respondents filed an Answer to the Amended Application in addition to a portion of the state court record.  In the Answer, Respondents explained

---

[2]  The Court finds this claim is exhausted based on Respondents' assertion that the claim was raised in the trial court and was presented to the CSC on interlocutory appeal in defending the trial court's order.  ECF No. 10 at 7.  Applicant did not deny that this claim was exhausted and was unclear in his Response to the Order to Show Cause that he did not want to proceed with this claim in this action, because he asserted opposing directions to the Court about this claim.  *See* ECF No. 16.  Applicant also did not disagree when the Court entered the partial dismissal order on October 7, 2011, and identified Claim Four as a pending claim to be addressed on the merits in this action.  He further discussed Claim Four in his Reply, ECF No. 24, to Respondents' Answer, and he again did not disagree that Claim Four was at issue in this action.

that the complete state court record in Applicant's criminal case was unavailable

because Applicant's direct appeal was pending in the  CCA.  The Court determined the

entire record was necessary to fully address the two claims that remain and ordered the

case to be held in abeyance until Mr. Hankins' direct appeal is concluded and the

record is available.

The unavailable portion of the state court record was provided to the Court on

January 4, 2016.

## III.  LEGAL STANDARDS

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be

issued with respect to any claim that was adjudicated on the merits in state court unless

the state court adjudication:

> (1)  resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the
> United States; or
>
> (2)  resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Court reviews claims of legal error and mixed questions of law and fact

pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003).  The threshold question the Court must answer under § 2254(d)(1) is whether

Applicant seeks to apply a rule of law that was clearly established by the Supreme

Court at the time his conviction became final.  *See Williams v. Taylor*, 529 U.S. 362,

390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court

decision." *Id.* at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases
> where the facts are at least closely-related or similar to the case *sub
> judice*.  Although the legal rule at issue need not have had its genesis in
> the closely-related or similar factual context, the Supreme Court must
> have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008) (citation omitted).  If there is no

clearly established federal law, that is the end of the Court's inquiry pursuant to

§ 2254(d)(1).  *See id.* at 1018.

If a clearly established rule of federal law is implicated, the Court must determine

whether the state court's decision was contrary to or an unreasonable application of

that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly
> established federal law if: (a) "the state court applies a rule
> that contradicts the governing law set forth in Supreme Court
> cases"; or (b) "the state court confronts a set of facts that are
> materially indistinguishable from a decision of the Supreme
> Court and nevertheless arrives at a result different from
> [that] precedent."  *Maynard* [*v. Boone*, 468 F.3d 665, 669
> (10th Cir. 2006)] (internal quotation marks and brackets
> omitted) (quoting *Williams*, 529 U.S. at 405, 120 S. Ct.
> 1495).  "The word 'contrary' is commonly understood to
> mean 'diametrically different,' 'opposite in character or
> nature,' or 'mutually opposed.' "  *Williams*, 529 U.S. at 405,
> 120 S. Ct. 1495) (citation omitted).

> A state court decision involves an unreasonable
> application of clearly established federal law when it
> identifies the correct governing legal rule from Supreme
> Court cases, but unreasonably applies it to the facts.  *Id.* at
> 407-08.

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. Furthermore,

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citations and internal quotation marks omitted). In conducting this analysis, the Court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also*

*Richter*, 562 U.S. at 102 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2).  *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court.  Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Applicant bears the burden of rebutting the presumption by clear and convincing evidence.  "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' "  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Court's analysis is not complete "[e]ven if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law."  *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006).  "Unless the error is a structural defect in the trial that defies harmless-error analysis, [the Court] must apply the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . ."  *Id.*; *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (providing that a federal court must

conduct harmless error analysis under *Brecht* anytime it finds constitutional error in a state court proceeding regardless of whether the state court found error or conducted harmless error review).

Under *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637. "[A] 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." *Bland*, 459 F.3d at 1009 (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). "Grave doubt" exists when "the matter is so evenly balanced that [the Court is] in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435. The Court makes this harmless error determination based upon a review of the entire state court record. *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000). "In sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Davis v. Ayala*, 576 U.S. ---, 135 S. Ct. 2187, 2199 (2015) (citing *Fry*, 551 U.S. at 119-120).

Furthermore, a claim may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Richter*, 562 U.S. at 98. In particular, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (collecting cases). Thus, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on

the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. "Where there has been one reasoned state judgment rejecting a federal claim," federal habeas courts should presume that "later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion fairly appear[s] to rest primarily upon federal law." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (citation and internal quotation marks omitted) (supported in *Hittson v. Chatman*, --- U.S. ---, 135 S. Ct. 2126, 2127 (June 15, 2015) (Ginsburg, J., concurring in denial of certiorari review).

Even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id.*

If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim de novo and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

## IV.  DISCUSSION

In Claim Four, Applicant asserts that Deputy Sheriff Gary Nichols tried to make him incriminate himself on July 7, 2007, while he was in custody and was not *Mirandized*.  Applicant further asserts in Claim Six that two Investigator Joe DeAngelo and Detective Jen Kenney committed a *Seibert* violation when they obtained multiple confessions before *Mirandizing* him on August 24, 2007.

The CSC addressed whether Applicant was in custody and subject to *Miranda* warnings as follows.

### B. Custodial Interrogation

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  *Miranda v. Arizona* protects this right by requiring the prosecution to establish that the police gave proper warnings before the suspect made a statement during custodial interrogation.  384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966); *People v. Breidenbach*, 875 P.2d 879, 885 (Colo.1994).

A trial court must suppress any statement made during a custodial interrogation not preceded by a proper *Miranda* warning.  *People v. Wood*, 135 P.3d 744, 749 (Colo.2006).  This does not mean that police officers are "required to administer *Miranda* warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed.2d 714 (1977) (per curiam).  A *Miranda* warning must be given when "there has been such a restriction on a person's freedom as to render him 'in custody.' "  *Id.*

Whether a person is in custody for *Miranda* purposes involves an objective test requiring the court to determine "whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Matheny*, 46 P.3d at 467 (quoting *People v. Taylor*, 41 P.3d 681, 691 (Co-lo.2002)); *see People v. Stephenson*, 159 P.3d 617, 620 (Colo.2007) ("The touchstone of custody is significant curtailment of the defendant's freedom of action that is equivalent to a formal arrest."); see also

*Thompson v. Keohane*, 516 U.S. 99, 113-14, 116 S. Ct. 457, 133 L. Ed.2d 383 (1995); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed.2d 317 (1984).  To determine whether the defendant had such a reasonable belief, a court must consider the totality of the circumstances. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed.2d 293 (1994); *Matheny*, 46 P.3d at 460.  Factors to consider include:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465-66 (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo.1997)); *People v. Dracon*, 884 P.2d 712, 717 (Colo.1994).  No single factor is determinative.  *Minjarez*, 81 P.3d at 353.  Telling the suspect he is free to leave does not necessarily mean that no *Miranda* warning is required, especially when all the external factors point to finding the defendant in custody.  *Id.* at 357; *Elmarr*, 181 P.3d at 1161.

The court may not consider the "unarticulated thoughts or views of the officers and suspects," because the custody test is objective in nature. *Elmarr*, 181 P.3d at 1162; *see Stansbury*, 511 U.S. at 323, 114 S. Ct. 1526 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

## C. Application to this Case

The prosecution contends that Hankins was not in custody when Investigator DeAngelo asked him, "Terry, tell us while we're here right now, what happened that night?"  To determine whether Hankins was in custody we must engage in "[a]n objective assessment of whether a reasonable person in [Hankins'] position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest."  *Matheny*, 46 P.3d at 467 (quoting *Taylor*, 41 P.3d at 691); *accord People v. Polander*, 41 P.3d 698, 705 (Colo. 2001).

Applying this standard to the facts, we conclude that Hankins was not in custody when he gave his initial confession. The totality of the circumstances demonstrate that he was not deprived of his freedom of action to the degree associated with a formal arrest when he led investigators to the burial site and returned with them back to his home. The investigators encouraged Hankins to tell the truth and warned him of the consequences of lying. *Matheny*, 46 P.3d at 467 (Defendant found not in custody when "officers were completely honest with Defendant," encouraged him to tell the truth and warned him of the consequences of lying, used a soft tone of voice, maintained a polite demeanor, and used "entirely reasonable" words. " 'There were no directions given to the Defendant,' and there was 'no restraint placed upon him.' " (Internal citations omitted)).

As in *Matheny*, where we also determined the defendant was not in custody, Hankins was unrestrained before and after he identified the location of the body. *Id.* Also like *Matheny*, the officer's words were reasonable, and the investigators' demeanor and tone remained consistently respectful, inquisitive, and unabrasive. The investigators did not direct Hankins; rather, Hankins suggested the drive to the burial site and the investigators followed his lead. Additionally, the investigators repeatedly told Hankins while driving to and from the site that Hankins was free to go. Based on these factors, like the defendant in *Matheny*, Hankins was not in custody at the time he gave his initial confession. *See id.* (finding the defendant "was not in custody when the interview began and, although long, nothing occurred during the interview, up until the time of the arrest, that would convert a noncustodial situation into a custodial one").

The trial court agreed with Hankins' argument that the act of identifying the body created a situation where an objectively reasonable person would anticipate and fear being arrested. This belief, the trial court found, was enough to place Hankins in custody at the time he identified the body and before he gave his initial confession. Therefore, the trial court concluded, Hankins should have been advised of his *Miranda* rights before this confession. However, expectation, apprehension, or knowledge of inevitable arrest are not the *Miranda* triggers; custody is. Here, although the interrogation was in progress, the surrounding factual circumstances fall short of demonstrating restraint equivalent to arrest.

Hankins chose to accompany the police to and from the burial site. The police treated him in a manner consistent with someone not in custody. *See, e.g., Matheny*, 46 P.3d at 467-68 (noting that although police intended to elicit a confession from defendant, "persuasion is not coercion, and the atmosphere and tone of the interview certainly did not

evince any attempt by the police to 'subjugate the individual to the will of his examiner' ") (quoting in part *Miranda*, 384 U.S. at 457, 86 S. Ct. 1602). The trial court found that all of Hankins' statements were voluntary, including the initial confession, and were not "the product of any coercion on the part of any law enforcement officers."

Hankins nevertheless analogizes his circumstances to one of the defendants in *Polander* who was:

> seized and subjected to a question about the ownership of contraband, under circumstances in which it was apparent to all that the police had grounds to arrest the occupants of the vehicle. Whether or not the police had announced that her seizure was elevated in their minds from an investigatory stop to an arrest, it is clear that the defendant had every reason to believe she would not be briefly detained and then released as in the case of an investigatory stop or a stop for a minor offense. Under these circumstances the defendant's freedom of action was curtailed to a degree associated with formal arrest.

41 P.3d at 705.

*Polander* is distinguishable from this case. In *Polander*, the police caught *Polander* and her friends using drugs in the back of a van, searched each of them as part of an investigatory stop, ordered them to sit on the curb, and handcuffed a member of the group before Polander made any incriminating statements to police. *Id.* at 701. In short, the police had seized Polander at the time she made the statements that resulted in suppression. *Id.* at 705.

The police had not seized Hankins when he gave his initial confession. He invited the police to his home to talk and voluntarily led them to and back from the burial site. He was not the subject of an investigatory stop or any other type of detention whereby law enforcement officers exercised power over him. A consensual interview that takes place at the defendant's request, on his property and at a place where he offered to drive the investigators does not exert the compulsive forces *Miranda* sought to prevent. *Berkemer*, 468 U.S. at 437, 104 S. Ct. 3138 (reiterating that *Miranda* applies only to those situations exerting "upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights"); *see Mathiason*, 429 U.S. at 495, 97 S. Ct. 711; *see also Matheny*, 46 P.3d at 468 (noting that "a consensual interview between a defendant and the police, that takes place in the presence of

the defendant's mother, does not exert the compulsive forces *Miranda* sought to prevent").

The trial court's conclusion that Hankins' initial confession was voluntary, coupled with facts demonstrating that this statement occurred under noncustodial circumstances, renders his initial confession admissible despite the lack of a *Miranda* warning. *People v. Platt*, 81 P.3d 1060, 1066 (Colo. 2004) ("Statements and confessions received as a result of a noncustodial interrogation are admissible, if they are voluntary."). Contrary to the trial court's conclusion, none of Hankins' statements at issue in this appeal should have been suppressed.

*People v. Hankins*, No. 08SA343,1218-20  (Colo. 2009).

Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), a suspect must be informed of certain rights when they are interrogated while in police custody.  If a suspect knowingly and intelligently waives a right to counsel after receiving *Miranda* warnings he may be questioned by a police officer.  *Davis v. United States*, 512 U.S. 452, 457 (1994).  However, if "a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 457-58.  If a suspect makes only an ambiguous or equivocal reference to an attorney that a reasonable officer would have understood that that the suspect "*might*" be invoking the right to counsel the police officer is not required to stop questioning. *Id.* at 459.  *Miranda*, however, only applies when a suspect is "in custody."  *United States v. Chee*, 514 F.3d 1106, 112 (10th Cir. 2008).

A suspect is in the "custody" of the police when he is "deprived of his freedom of action in any significant way or his freedom of action is curtailed to a degree associated with formal arrest." *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (internal quotation marks and citations omitted).  Stated another way, the question is

16

whether, under the totality of the circumstances, "a reasonable [person] in the suspect's position would have understood [the] situation . . . ; as the functional equivalent of formal arrest." *Id.* (internal quotation marks and citation omitted).

Whether a suspect is "in custody" depends upon "the objective circumstances of the interrogation." *Stansbury v. California* , 511 U.S. 318, 323 (1994).   The courts must "examine all of the circumstances surrounding the interrogation," but the "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury*, 511 U.S. at 322. (internal quotation marks and citations omitted).  However, the test involves no consideration of the particular suspect's "actual mindset."  *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2011) (found the state court's failure to consider a suspect's age does not provide a basis for finding a state court's decision was unreasonable application of established law).

Courts consider several factors to determine whether, under the totality of the circumstances, a reasonable person would have understood his situation as one akin to formal arrest.  *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008).  Those factors include (1) whether the suspect was aware that he could refrain from answering questions or end the interview at will, (2) whether the questioning was prolonged and accusatory, and (3) whether the questioning took place in a police-dominated atmosphere.  *Id.* at 1240.

### A. Claim Four/Deputy Sheriff Gary Nichols' Failure to *Mirandize*

Applicant asserts that during the July 7, 2007 execution of the search warrant at "Ace NO.& claim" (Applicant's mine and residence), he was definitely under the control

of Deputy Sheriff Nichols, equivalent to an arrest, without being *Mirandized*.  ECF No. 6 at 8.  Applicant further asserts that Deputy Nichols later testified at trial that "Hankins teared up when Nichols suggested Cynthia have a Christial [sic] burial and Hankins said 'Gary, I had to do something as she was about to kill me!' " *Id.*  Applicant contends that Nichols was trying to get him to say something self-incriminating and that he definitely was in custody without a *Miranda* warning.  *Id.*

First, based on the findings below, the Court notes that Mr. Nichols testified, at the pretrial motions hearing, that during a conversation with Applicant on August 23, 2008, Applicant "slumped over the bench, put his head down, and stated, Gary, I had to do something, she was going to kill me,"  *Hankins*, No. 2007CR159, Oct.1, 2008 Pretrial Hr'g at 103, and at one point, when talking about the victim, he put his hand on Applicant and Applicant "looked up, his eyes were —he teared up as if he was about to cry," *id.* at 108.

The Court further notes, that on the audio DVD, Exhibit 9, of the interviews with Applicant by Detective Jen Kenney and Investigator Joe DeAngelo on August 24, 2007, Applicant stated that on the day prior to the August 24 interview Gary Nichols tried to get him to talk to Ms. Kenney and Mr. DeAngelo.  Case No. 07CR159, Aug. 24, 2007 #1, Audio DVD, Ex. 9.  Applicant does not identify any other discussion with Mr. Nichols other than the one on August 23, 2007, regarding the investigation.  *Id.*  Applicant only states on the DVD that Mr. Nichols had been to his residence in January 2007, but he does not indicate why.  *Id.*

From Mr. Nichols' testimony during the pretrial hearing and the statement by Applicant regarding his conversation with Mr. Nichols on August 23, it appears

Applicant may have confused the actions that took place on August 23 as taking place on July 7.  Nonetheless, even if the conversation Applicant is referencing took place on July 7, that Applicant slumped in his seat, teared up, and then stated to Mr. Nichols he had to do something or the victim would have killed him, nothing else that Applicant states in Claim Four regarding his statement, whether it took place on July 7 or August 23, 2007, indicates that he was in custody at the time he made those comments to Mr. Nichols.

In his Reply, Applicant states that (1) his vehicles were confiscated during the July 7 search; (2) he lived in a remote area; and (3) he was asked not to leave the area. ECF No. 14 at 2.  These claims are conclusory and also fail to state how his interaction with Mr. Nichols at the time of their conversations was equivalent to being in custody.

Mr. Nichols' testimony is set forth below.  Applicant does not disagree with Mr. Nichols' testimony.

During the pretrial hearing held on October 1, 2008, that addressed Applicant's motion to suppress statements, Mr. Nichols testified as follows.

DIRECT EXAMINATION

BY MR. STAHL:

Q Good morning, Deputy Nichols, would you please state your
full name for the record and spell your last name?

A Gary L. Nichols. Last name N-I-C-H-O-L-S.

Q And how are you employed?

A As a Deputy Sheriff with the Moffat County Sheriff's
Department in Craig, Colorado.

Q And how long have you been so employed?

A 25 years.

Q Were you involved at all in the investigation of the
Terry Hankins case?

A Yes, I was.

Q What was your involvement?

A On two separate instances I was asked to stand by with
the prosecutors and the Craig PD as a standby while they did a
search warrant.

Q And what were those instances?

A One was in July and one was in August of 2007.

Q Okay. Tell me about the July 7th instance, what did you
do?

A July 2007 I was requested by the Craig PD and the
District Attorney's office to go to 63547 Highway 13 north of Craig
to Terry Hankins' residence to assist with the execution of a
search warrant. Basically I was there to -- not to detain but to
just make sure Mr. Hankins didn't interfere with that search
warrant, and just stood by with him while a search warrant was
being executed.

Q Did you have any conversations with Mr. Hankins about
whether or not he was free to leave if he didn't want to stay
there.

A My assumption on that, he was free to leave.  Officer
Jennie -- Jennie -- Kenney contacted Mr. Hankins and advised him
that he was free to leave. And so, I just stood by with him while
he went about his work on his site.

Q Did you talk with him during that period of time?

A We carried on a conversation, yes.

Q What did you talk about?

A The general things such as weather, about his mine claim, farm tractors, our families.  Pretty much just general talk. Nothing that really dealt with Mrs. Hankins.

Q Did you question him about this case?

A No.

Q And what was Mr. Hankins doing while you were staying with him?

A He was hand digging a ditch or a trench with a pick and a shovel.

Q And did Mr. Hankins do anything to help accommodate you?

A Well --

MR. MCFEE: Judge, I'm going to object because -- only because I don't know what date we are talking about.

THE COURT: July 7, 2007.

MR. MCFEE: Thank you.

THE WITNESS: I had just gotten back to work from a back injury and my back was bothering me, so he went and got a chair for me and set it down by the little shed that had a farm tractor inside of it.  Just sat there on a chair and just watched and visited while he kept working, going about his work so he wouldn't interfere.

Q (BY MR. STAHL) Did anyone else question or even talk to Mr. Hankins while you were watching him?

A Not that I recall.

Q Did Mr. Hankins have access to food and water and that sort of thing?

A At one point, I think it was around lunchtime, he actually went back to his residence and got a bottle of water and made himself a sandwich, and he offered it to me. I chose not to eat.

Q And what happened after that?

A He went back to work after he ate and got his water.  He
went back to digging.  And at one point they completed their search
warrant and was advised they were done, and I left and I went and
ate lunch. . . .

*Hankins*, No. 2007CR159, Oct.1, 2008 Pretrial Hr'g at 53-56.

During cross-examination Mr. Nichols testified that (1) he had a cordial

relationship with Applicant; (2) had been to Applicant's property, where the search was

conducted on July 7, 2008, on a dozen previous occasions, *id.*, at 70; (3) he did not

know his role in the search prior to arriving, or the details of the search warrant, *id.* at 72

and 76; (4) he was not told to pay attention to anything Applicant said on July 7 or to

wear a "wire," but he would have reported to officers Kenney and DeAngelo anything of

significance that Applicant said, *id.* at 73 and 84; and (5) all he knew at that time was

Applicant's wife was a missing person and Applicant was a possible suspect, *id.* at 76.

Mr. Nichols also testifies he drove a marked sheriff's car to Applicant's on July 7,

was wearing a uniform and had a weapon, and at least six other officers were there in a

total of about four vehicles.  *Id.* at 77 and 80.  He also stated that Officer Kenney told

Applicant that he could leave and that no one else talked with Applicant while the

search was conducted on July 7.  *Id.* at 79 and 82.

Because (1) Mr. Nichols was simply standing by; (2) Applicant had been told he

was free to leave; (3) Applicant and Mr. Nichols were outside; (4) Applicant continued to

work; and (5) at one point Applicant went to his residence, made a sandwich to eat, got

a bottle of water, and even offered the sandwich to Mr. Nichols, the Court finds that

Applicant was not in custody and any conversation that did pertain to the victim or to

Applicant's relationship with the victim that he had with Mr. Nichols on July 7, 2007, would not be considered a custodial interrogation that would require a *Miranda* warning.

As for August 23, 2007, Mr. Nichols asserts, in cross-examination, his role was the same as July 7, to stand by and be sure Applicant did not get in the way of the search; but he was an acquaintance of Applicant so they were comfortable talking with each other. No. 2007CR159, Oct. 01, 2008 Pretrial Hr'g Tr. at 86. Mr. Nichols further testified that on August 23 Mr. DeAngelo told Applicant he was free to leave while the search took place; but Applicant chose not to leave because he had work to do on the property and that he assisted Applicant in the various chores and tasks. *Id.* at 92-93. Mr. Nichols also testified their conversation was pretty general at first about the weather, wildland fires, and Mr. Nichols' archery permit for antelope; but he further testified the conversation did turn to a discussion about Applicant's inability to sleep and the District Attorney's Office harassing him. *Id.* at 98.

Mr. Nichols further testified that he told Applicant (1) the "cadaver dog" had "alerted" on his van and the couch; (2) tests would be back from the Colorado Bureau of Investigation soon; and (3) Applicant could expect to see more investigators in the future. *Id.* at 101-02. Mr. Nichols also agreed that he told Applicant he found it strange that Applicant would forge a check that was sent to the victim from her employer and that there is a big difference between first degree murder and self-defense or an accident. *Id.* at 104-05. Mr. Nichols further agreed, while testifying, that Applicant then stated they will have to prove it, but no one would believe my story, at which point he told Applicant he was free to leave, but Applicant continued to say he was concerned about going to prison for the rest of his life. *Id.* at 105.

23

Mr. Nichols went on to testify that Applicant stated he thought the victim was going to kill him and he had to do something, and Applicant then slumped over the bench; at which time Mr. Nichols told Applicant that Applicant should then help to find the victim's remains so the family can bury her and have a place to go to remember her. *Id.* at 107-08.  Finally, Mr. Nichols testified that at this point Applicant stated he had an attorney and his attorney would not want him to make any more statements; after which the conversation returned to other topics and they continued to do the chores.  *Id.* at 108-09.

Just like the Court's finding above regarding July 7, 2007, the totality of the circumstances does not suggest that Applicant was in custody on August 23, 2007, when Mr. Nichols was assigned to be with Applicant so he did not interfere with the search.  Mr. Nichols talked with Applicant and assisted with the chores.  They were outside.  When Applicant elected to move lumber materials from one part of the property to another, using his van, Mr. Nichols offered to assist him and Applicant agreed.  The conversation for the most part was about the weather, hunting, and mining, and when the conversation involved the victim there is no indication that Applicant was directed to provide a response, and that his response was not freely given.  Finally, Applicant was told he was free to leave when he did provide a response that could be incriminating.  The Court finds that Applicant was not in custody and any conversation that did pertain to the victim or to Applicant's relationship with the victim that he had with Mr. Nichols on August 23, 2007, would not be considered a custodial interrogation that would require a *Miranda* warning.

24

Based on the totality of the circumstances, as described by Mr. Nichols, and not disclaimed or presented otherwise by Applicant, other than general statements that his vehicles were impounded due to the July 7 search, he lived in a remote area, and was told not to leave the area, a reasonable person would not have thought that he was formally under arrest or in custody during the conversations he had with Mr. Nichols on July 7 and August 23, 2007.  *See Stansbury*, 511 U.S. at 322-23 (The courts must "examine all of the circumstances surrounding the interrogation," but the "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.); *Jones*, 523 F.3d at 1240 (10th Cir. 2008) (consider whether the suspect was aware that he could refrain from answering questions or end the interview at will, (2) whether the questioning was prolonged and accusatory, and (3) whether the questioning took place in a police-dominated atmosphere).

Claim Four, therefore, will be dismissed as meritless because any court decision regarding Applicant's conversations with Mr. Nichols on July 7 or August 23, 2007, did not result in a decision that was contrary to, or involve an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

**B. Claim Six/*Seibert* Violation by DeAngelo and Kenney**

Applicant asserts that on August 24, 2007, Investigator Joe DeAngelo and

Detective Jen Kenny obtained multiple confessions from him without a *Miranda* warning

in violation of *Seibert*.  ECF No. 6 at 8.

Upon review of the two audio DVD's and the one video DVD, Case No.

07CR149, Exhibits 9 and 10, the Court finds as follows.  First, on August 24, 2007,

Applicant asked that at least Mr. DeAngelo come to his home to discuss certain checks

he had either written or endorsed on behalf of the victim after she was murdered.  Ex.

9., Audio DVD #1.  Second, when Mr. DeAngelo and Ms. Kenney arrived at Applicant's

residence, although he was sleeping, he woke up and indicated to them to come inside,

and directed them where to sit.  *Id.*

During the course of the day on August 24, 2007, while Mr. DeAngelo, Ms.

Kenney, and Applicant either sat at a table at Applicant's residence, were in the car

driving to and from the burial site or to Craig to the Public Safety Center, (The Craig

Police Department and the Moffat County Sheriff are located at this center.), or were at

the burial site, which transpired over a period of about six hours, the conversation

among the three was cordial, at some times light-hearted, and respectful.  Ex. 9, Audio

DVD's #'s 1 and 2; Ex. 10, Video DVD.  The tone of the conversation was never

argumentative, demeaning, or aggressive.  Applicant was (1) very lucid; (2) able to state

the ages of his three children and where they lived; (3) able to provide directions to the

burial site; (4) noted that Mr. DeAngelo incurred damage to his car while driving to the

burial site; (5) talked about himself and asked questions about Mr. DeAngelo's past

work career; and (6) described at length the history of the mining industry in Colorado.

Prior to the time that Applicant told Ms. Kenney and Mr. DeAngelo that he would take them to the burial site, their conversation involved (1) the checks Applicant had deposited; (2) how Applicant had gotten into mining and the history of mining in Colorado; (3) the annoying flies in Applicant's residence; (4) Applicant's family; (5) his association with a woman located in West Virginia; and (6) why pain pills (Oxycodone) were found in his residence during a previous search. Ex. 9, DVD #1. Applicant also asked if Ms. Kenney had heard from the victim's family, and she responded only via telephone. *Id.*

Mr. DeAngelo then stated that he wanted to let Applicant know what the situation is and the ways that "we" can proceed. *Id.* Applicant stated that he knew he was in "pretty deep trouble." *Id.* Ms. Kenney and Mr. DeAngelo then proceeded to tell Applicant that the victim's family is concerned about him, the family needs closure, and the situation needs to be resolved sooner than later. *Id.*

Both Ms. Kenney and Mr. DeAngelo told Applicant that they know the victim was abusive and that Applicant had put up with a lot from her. *Id.* Applicant stated the victim was bipolar, which was aggravated with her abusing alcohol and drugs. *Id.* Mr. DeAngelo then stated that he knew Applicant had been taken to the cleaners by the victim; but the situation could be resolved quickly, and the victim could then have a Christian burial. *Id.* Applicant then acknowledged that the issue would be resolved by going to court, which would affect the rest of this life. *Id.*

Mr. DeAngelo further stated that Applicant is a good man and there is always a self-defense consideration. *Id.* Mr. DeAngelo went on to state that there is a big difference between premeditation and someone who is a victim defending himself. *Id.*

Applicant stated that any action would have to be shown and proved.  *Id.*  Ms. Kenney further stated that all they had learned about his relationship with the victim is documented and that their job, meaning hers and Mr. DeAngelo's, was to find the truth. *Id.*  Applicant acknowledged he understood the process regarding a prosecution and having a defense attorney.  *Id.*

At this point, Mr. DeAngelo asked Applicant to tell them what happened, to which Applicant responded he would have to talk with his attorney.  *Id.*  Ms. Kenney then told Applicant, "just know we're here."  *Id.*  Mr. DeAngelo then stated this is a very serious issue and it will be solved when the victim is located.  *Id.*  Ms. Kenney added the children do need a place to go and grieve.  *Id.*  Applicant then said he would show them where she is, but he believed his attorney would be against it.  *Id.*  Applicant, however, offered to drive Ms. Kenney and Mr. DeAngelo to the grave site because of the terrain and his concern that Mr. DeAngelo's vehicle would not make it.  *Id.*

Applicant, Ms. Kenney, and Mr. DeAngelo then drove in Mr. DeAngelo's car to the burial site.  *Id.*  While in the car at the burial site, Mr. DeAngelo asked Applicant to tell him what happened but also reminded him that he was free to go and to not feel because he was in the car that he was "closed in" and not free to go.  *Id.*  Applicant responded, "Let's get it done."  *Id.*  Two more times while in the car either at the site or when they returned to residence, Mr. DeAngelo reminded Applicant that he was free to go.  *Id.*

Mr. DeAngelo then *Mirandized* Applicant, which Applicant responded that he understood; then once back at the residence Applicant signed the *Miranda* statement, after which he provided a statement that described with detail the incidents that lead up

28

to the killing and the actions he took after the killing.  *Id.*  A couple of times during the statement Applicant gave indication he needed to stop, and at one point, Ms. Kenney prepared Ravioli from a can for Applicant to eat.  *Id.*  Applicant stated in response to a question by Mr. DeAngelo if he had told anyone about the killing, that he had told his attorney, who told him not to tell anyone; but he "didn't listen to that" – "told [Mr. DeAngelo] everything."  *Id.*  At another point in time, it is audible that Applicant states to himself "cry baby," and Mr. DeAngelo tells Applicant it will be okay.  *Id.*

Mr. DeAngelo tells Applicant again he is free to go and does not have to return to the burial site if he does not want to, but he indicates he wants to go to burial site again and help "stake it."  DVD #2.  After Mr. DeAngelo, Ms. Kenney, and Applicant return again to Applicant's residence, Mr. DeAngelo asks Applicant if he is willing to go to Ms. Kenney's office and make am audio/video statement, to which he replied, "sure."  *Id.* Mr. DeAngelo tells him it is voluntary for him to go.  *Id.*  At the residence, Applicant relaxes and lays down for a while.  *Id.*  Before they leave for Ms. Kenney's office, Mr. DeAngelo reads and has Applicant sign a permission statement for the burial site to be dug up, which without disagreement Applicant signs.  *Id.*

At this point, Applicant asks if he should take anything with him, and Mr. DeAngelo tells him he probably is not coming back.  *Id.*  Applicant asks if he should have an attorney at the meeting at Ms. Kenney's office, to which Mr. DeAngelo responds that is totally up to him, and he cannot give him legal advise.  *Id.*  During the drive to Ms. Kenney's office all three engage in general conversation.  *Id.*  Applicant is alert, aware of his surroundings, describes with detail his childhood and early adulthood, and asks Mr. DeAngelo about his work history.  *Id.*  They stop at a fast food

restaurant and then continue to Ms. Kenney's office, where their interaction is subject to a audio/video recording.  Ex. 9, DVD #2; Ex. 10, Video DVD.  At the beginning of the one hour and four minute recording, Mr. DeAngelo reads and has Applicant sign a *Miranda* statement, which Applicant visually and audibly indicates he understands and signs without concern.  Ex. 10, Video DVD.  During the video, Applicant appeared relaxed, calm, and willing to make his statement.  *Id.*  Neither Ms. Kenney's nor Mr. DeAngelo's questions were intimidating or directives and their body language was relaxed and nonconfrontational.  *Id.*  At the end of the interview, Applicant signed a statement, Mr. DeAngelo told Applicant he was going to jail for a while, and Applicant was placed in handcuffs without incident.  *Id.*

Contrary to Applicant's claim, he was *Mirandized*, on at least two occasions; first time he was *Mirandized* after returning from the burial site and the other at the Public Safety Center.  Each time Applicant acknowledged his rights.  The only remaining issue, which was addressed by the CSC, is whether Applicant was in custody when he made statements at the burial site, after he stated she's under the pile of dirt about five feet down, and in response to Mr. DeAngelo's asking him to tell them what happened.

Because (1) Applicant invited Mr. DeAngelo to his home to talk; (2) he was told he was free to go; (3) he decided to take Ms. Kenney and Mr. DeAngelo to the burial site and offered to drive them to the site; (4) the conversation between Mr. DeAngelo, Ms. Kenney, and Applicant was always cordial and respectful and did not contain directives, (other than Mr. DeAngelo stating tell us what happened and in response, after being told he was free to go, Applicant responded "let's get it done,"); and (5) there was no attempt to confine Applicant in a certain place, a reasonable person in his

position would not have understood that he was in custody after showing Ms. Kenney and Mr. DeAngelo the burial site and telling them what had happened to the victim. *See Stansbury*, 511 U.S. at 322-23 (The courts must "examine all of the circumstances surrounding the interrogation," but the "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.); *Jones*, 523 F.3d at 1240 (10th Cir. 2008) (consider whether the suspect was aware that he could refrain from answering questions or end the interview at will, (2) whether the questioning was prolonged and accusatory, and (3) whether the questioning took place in a police-dominated atmosphere).

Applicant, therefore, clearly does not assert a *Seibert* violation. *Missouri v. Seibert*, 542 U.S. 600 (2004) (during a custodial interrogation that requires a warning of an individual's rights, the warnings cannot be ignored until there is a confession).

Based on the above findings, the CSC decision regarding this claim did not result in a decision that was contrary to, or involve an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Claim Six, therefore, will be dismissed on the merits.

## V. CONCLUSION

Accordingly, it is ORDERED that Applicant Terence J. Hankins' Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Application") (ECF No. 6) is DENIED and the civil action is dismissed WITH PREJUDICE. It is

FURTHER ORDERED that each party shall bear his own costs and attorney's fees.  It is

FURTHER ORDERED that no certificate of appealability will issue because Applicant Terence J. Hankins has not made a substantial showing of the denial of a constitutional right, pursuant to 28 U.S.C. § 2253(c).  It is

FURTHER ORDERED that the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he also must pay the full $505 appellate filing fee or file a motion to proceed in forma pauperis in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

Dated this 23rd day of February, 2016.

BY THE COURT:

William J. Martinez
United States District Judge

32